# Congressional Pay Amendment

The Congressional Pay Amendment, which was originally proposed by Congress to the States for ratification in 1789, and having been ratified by three-fourths of the States, has been ratified pursuant to Article V and is accordingly now part of the Constitution.

Under 1 U.S.C. § 106b, the Archivist was, upon receipt of formal instruments of ratification from the requisite number of States, required to publish the Congressional Pay Amendment along with his certificate specifying that the Amendment has become valid, to all intents and purposes, as part of the Constitution.

May 13, 1992

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

You have asked for a summary of our views, on an expedited basis, on whether the Congressional Pay Amendment has been duly adopted in accordance with the formal requirements of Article V of the Constitution. The General Counsel of the National Archives and Records Administration has informed us that the Archivist of the United States has received word that a total of thirty-nine States have adopted the Amendment, one more than the three-fourths required under Article V. The Archivist expects to have received formal instruments of ratification from all the necessary States shortly and informs us that no state has purported to rescind its ratification.

Article V of the Constitution provides:

> The Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution . . . which . . . shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress . . . .

Congress proposed the Pay Amendment to the States in 1789, by a resolution concurred in by two-thirds of both Houses. 1 Stat. 97 (1789). That resolution further provided that the Amendment would be valid as part of

85

the Constitution "when ratified by three fourths of the [State] legislatures." *Id.* As the Amendment was proposed by the requisite majorities of both Houses of Congress, and has been ratified by the legislatures of three-fourths of the States, it has met all of the requirements for adoption set forth in Article V.

Section 106b of title 1, United States Code, provides:

> Whenever official notice is received at the National Archives and Records Administration that any amendment proposed to the Constitution of the United States has been adopted, according to the provisions of the Constitution, the Archivist of the United States shall forthwith cause the amendment to be published, with his certificate, specifying the States by which the same may have been adopted, and that the same has become valid, to all intents and purposes, as a part of the Constitution of the United States.

Accordingly, upon the receipt of formal instruments of ratification of the Pay Amendment from three-fourths of the States, the Archivist must forthwith cause the Amendment to be published with his certificate specifying the States by which it has been adopted, and that the Amendment has become valid, to all intents and purposes, as a part of the Constitution of the United States. The effective date of the Amendment is the date on which it was ratified by the thirty-eighth State to do so.

TIMOTHY E. FLANIGAN
*Acting Assistant Attorney General*
*Office of Legal Counsel*

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

You have asked us to memorialize the detailed analysis underlying the advice rendered to you earlier this year in connection with the ratification of the Congressional Pay Amendment, originally proposed by Congress to the States for ratification in 1789. You also asked us to address the question whether the Archivist of the United States, upon receipt of formal instruments of ratification from the requisite number of states, was required to certify that the Congressional Pay Amendment has become part of the Constitution.[1]

For the reasons set forth below, we conclude that the Congressional Pay Amendment has been ratified pursuant to Article V and is accordingly now part of the Constitution, and that the Archivist was required to issue his certification to that effect in accordance with 1 U.S.C. § 106b.

## I.

## A.

The procedures for amending the Constitution are set forth in Article V:

> The Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or, on the Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress.

---

[1] We have relied upon the Archivist of the United States for his official tally of the ratifying States. In addition to the forty states listed in the Archivist's certification, see 57 Fed. Reg. 21,187, 21,188 (1992), we understand that California ratified the amendment on June 26, 1992, see 138 Cong. Rec. E2237 (daily ed. July 24, 1992). We set forth in detail the history of the Congressional Pay Amendment's ratification by the States in the accompanying Appendix.

*The Constitution of the United States: Analysis and Interpretation*, S. Doc. No. 16, 99th Cong., 1st Sess. 18 (Johnny H. Killion ed., 1987) (*"Constitution Annotated"*). Thus, Congress or a convention proposes an amendment, Congress proposes a mode of ratification, and the amendment becomes part of the Constitution when ratified by three fourths of the States. The ratification of the Congressional Pay Amendment followed this process. Congress proposed the amendment and directed it to state legislatures for ratification. Act of Sept. 23, 1789, ch. 27, 1 Stat. 97 (1789) (Amendments to the U.S. Constitution). Three fourths of the several States have now ratified it. 57 Fed. Reg. 21,187, 21,188 (1992); *see also* Appendix.[2] By a straightforward reading of Article V, the amendment is now "valid to all Intents and Purposes, as Part of th[e] Constitution."

That the ratification of the Congressional Pay Amendment has stretched across more than 200 years is not relevant under the straightforward language of Article V. Article V contains no time limits for ratification. It provides simply that amendments "shall be valid to all Intents and Purposes . . . *when ratified.*" Thus the plain language of Article V contains no time limit on the ratification process.

Nor are we aware of any other basis in law for adding such time limits to the Constitutional amendment process, other than pursuant to the process itself. Indeed, an examination of the text and structure of Article V suggests that the absence of a time limit is not an accident. The procedure prescribed in Article V necessarily implies that some period of time must pass between the proposal of an amendment and its final ratification by the requisite number of States.[3] This suggests that if a time limit on the process were intended, the time limit would be stated in terms. Moreover, Article V does deal with a question concerning time limits, and does so quite precisely: no amendment affecting "the first and fourth Clauses in the Ninth Section of the first Article" was permitted to be made "prior to the Year One thousand eight hundred and eight." If the Framers had contemplated some terminus of the period for ratification of amendments generally, they would have so stated.

The rest of the Constitution strengthens the presumption that when time periods are part of a constitutional rule, they are specified. For example, representatives are elected every second year, U.S. Const. art. I, § 2, and a census must be taken within every ten year period following the first census,

---

[2] The Archivist also informs us that no State has transmitted to the federal government a document purporting to rescind a prior ratification. In the early 1800's, the Vermont legislature, which had previously ratified the amendment, passed a resolution opposing a later, nearly identical proposal by the Kentucky legislature. *See* 1817 Vt. Laws 100-01. There is no evidence, however, that Vermont attempted to rescind its previous ratification. Several states did expressly reject the Congressional Pay Amendment when it was first proposed, though only New Hampshire appears to have formally notified the federal government of that fact. *See* 1 *Documentary History of the First Federal Congress of the United States of America* 348 (Linda Grand DePauw, et. al., eds. 1972) ("1 *First Congress*"); Appendix at pp. A-3 to A-4.

[3] *See* Joseph Story, *Commentaries on the Constitution of the United States* § 959, at 681 (1833) (reprinted 1987) (formal requirements of Article V indicate that "[t]ime is thus allowed, and ample time, for deliberation, both in proposing and ratifying amendments") (*"Commentaries"*).

which was required to be taken within three years of the first meeting of Congress. *Id.* Neither House of Congress may adjourn for more than three days without the consent of the other, U.S. Const. art. I, § 5, and the President has ten days (Sundays excepted) within which to sign or veto a bill that has been presented to him. U.S. Const. art. I, § 7. The Twentieth Amendment refers to certain specific dates, January 3rd and 20th. Again, if the Framers had intended there to be a time limit for the ratification process, we would expect that they would have so provided in Article V.[4]

The records of the drafting and ratification of the Constitution contain no hint that Article V was intended to contain any implicit time limit. *See, e.g., Dillon v. Gloss*, 256 U.S. 368, 371 (1921). The issue appears not to have arisen at the time of the framing, but has since been debated in Congress from time to time. Throughout most of those debates, the dominant view has been that the Constitution permits the ratification process to proceed for an unlimited period of time. The first discussion we have found of the question whether a proposed constitutional amendment remains viable indefinitely came in 1869, when Senator Buckalew introduced a measure to regulate the time and manner in which state legislatures would consider the Fifteenth Amendment. In support of his proposal, he stated that because of the confusion created by States that either ratify after rejecting, or reject after ratifying, "we are in this condition that you cannot have a constitutional amendment rejected finally at all in the United States; rejections amount to nothing, because ratifications at some future time, ten, twenty, fifty, or one hundred years hence, may give it validity." Cong. Globe, 40th Cong., 3d Sess. 913 (1869). Senator Bayard, opposing a related proposal, stated his belief that "as long as the proposed amendment has neither been adopted by three fourths of the States nor rejected by more than one fourth, it stands open for . . . action." *Id.* at 1312.

The Senate and House debates regarding proposal of the Eighteenth Amendment in 1917 also indicate a common belief that Article V contains no time limits. For example, in his remarks on the need for limiting time for state ratification, Senator Ashurst explained that two of the first twelve amendments proposed by Congress "are still pending . . . and have been for 128 years." 55 Cong. Rec. 5556 (1917). Senator Borah expressed the view that "[t]he fundamental law of the land does say very plainly, that it places no limitation upon the time when or within which [an amendment] must be ratified. It says 'when ratified', and fixes no limit." *Id.* at 5649. Senator

---

[4] The Constitution also contains provisions that refer to time but not to a specific period or date. The Twelfth Amendment provides that when the House of Representatives must choose the President, it is to ballot "immediately" (presumably to prevent intrigue and cabal); the Vice President shall "immediately" assume the office of President under certain circumstances, U.S. Const. amend. XXV, § 4; the first Senate was "immediately" to divide itself into three classes for purposes of determining when terms of office expired, U.S. Const. art. I, § 3, cl. 2; the Sixth Amendment requires that accused persons receive a "speedy" trial. The Constitution also requires that certain duties be performed "from time to time." *See* U.S. Const. art. I, § 5, cl. 3 (publication of journal of Congress); art. I, § 9, cl. 7 (publication of statement of accounts); art. II, § 3 (President's state of the union message). The common theme of all these provisions is that when time is part of a constitutional rule, the document so provides.

Cummins offered a separate amendment to Article V, stating that "I am in favor of supplying what is manifestly a defect in our Constitution and providing some limit of time . . . ." *Id.* at 5652. Senator Overman later stated that "as the Constitution is now, . . . an amendment . . . can be submitted for a thousand years and be in force whenever ratified." 56 Cong. Rec. 10,098 (1918). In the House, Representative Reavis objected to any time limit in the Constitution. "The amendment is submitted until enough legislatures have passed upon it to indicate whether or not it will be approved by three-fourths of them." 56 Cong. Rec. 444 (1917). Representative Steel replied that without a time limit, "when a proposed constitutional amendment goes out to the States it rests there for agitation for all time without any limitation whatever." *Id.* at 445.

Thus, although there was much disagreement on the issue — later addressed in *Dillon v. Gloss* — whether *Congress* could impose time limits for state ratification of a proposed constitutional amendment in the absence of a separate amendment to Article V, there was little doubt as to the rule established by the Constitution itself: the proposed amendment remained viable, at least until rejected by more than one-fourth of the States.[5]

Thus, the text and history of Article V make plain that any argument that there is a time limit on the ratification process must be based on some ground other than text and history.

### B.

#### 1.

Two decisions of the Supreme Court, *Dillon*, and *Coleman v. Miller*, 307 U.S. 433 (1939), have been cited for the proposition that Article V requires that the ratification of constitutional amendments takes place within a "reasonable" time after proposal.[6] That doctrine is not within the holding of those cases, however, and we believe that any dicta supporting the doctrine are unsound.

In upholding Congress's power to limit to seven years the time for ratification of the Eighteenth Amendment, the Supreme Court in *Dillon* stated "that the fair inference or implication from Article V is that the ratification [of an amendment] must be within some reasonable time after the proposal." 256 U.S. at 375. If this reasoning is controlling and Article V does contain

---

[5] It is especially telling that so many of those who thought that the Constitution imposed no time limit on the amendment process thought this feature to be a defect in the document; had they thought the question a close one, or if any textual argument had been available, they might have resolved it in favor of what they took to be the preferable outcome.

[6] *See, e.g., Equal Rights Amendment Extension: Hearings on S.J. Res. 134 Before the Subcomm. on the Constitution of the Senate Comm. on the Judiciary,* 95th Cong., 2d Sess. 117 (1978) ("Senate Hearings") (testimony of Prof. Thomas I. Emerson, Yale University); *id.* at 144 (testimony of Prof. Jules B. Gerald, Washington University); *id.* at 266 (statement of Prof. Ruth B. Ginsburg, Columbia University).

an implicit requirement that proposal and ratification be reasonably contemporaneous, the Congressional Pay Amendment almost certainly would be invalid.[7]

Although recognizing that Article V "says nothing about the time within which ratification may be had," *id.* at 371, the Court in *Dillon* identified three grounds for concluding that Article V "strongly suggests" that a proposed amendment may not remain "open to ratification for all time" and that ratification in some States may not be "separated from that in others by many years and yet be effective." *Id.* at 374. The Court stated:

> *First*, proposal and ratification are not treated as unrelated acts but as succeeding steps in a single endeavor, the natural inference being that they are not to be widely separated in time. *Secondly*, it is only when there is deemed to be a necessity therefor that amendments are to be proposed, the reasonable implication being that when proposed they are to be considered and disposed of presently. *Thirdly*, as ratification is but the expression of the approbation of the people and is to be effective when had in three-fourths of the States, there is a fair implication that it must be sufficiently contemporaneous in that number of States to reflect the will of the people in all sections at relatively the same period, which of course ratification scattered through a long series of years would not do.

*Id.* at 374-75 (emphases added).[8]

---

[7] Indeed, the Court in *Dillon* suggested that the period for ratification of the Congressional Pay Amendment, along with that of three other long-dormant proposed amendments, had lapsed:

That [construing Article V to require contemporaneous ratification] is the better conclusion becomes even more manifest when what is comprehended in the other view is considered; for, according to it, four amendments proposed long ago — two in 1789, one in 1810 and one in 1861 — are still pending and in a situation where their ratification in some of the States many years since by representatives of generations now largely forgotten may be effectively supplemented in enough more States to make three-fourths by representatives of the present or some future generation. To that view few would be able to subscribe, and *in our opinion it is quite untenable.*

*Id.* (emphasis added). *See also* Memorandum from David C. Huckabee, Analyst, and Thomas M. Durbin, Legislative Attorney, Congressional Research Service, Library of Congress, *Re: The Proposed Congressional Pay Constitutional Amendment: Issues Pertaining to Ratification*, at 2-3 (Aug. 12, 1991) ("CRS Memorandum").

[8] In support of the notion of contemporaneous consensus, the Court quoted with approval a passage from John A. Jameson, *A Treatise on Constitutional Conventions* (Da Capo Press 1972) (4th ed. 1887), in which Jameson wrote:

The better opinion would seem to be that an alteration of the Constitution proposed to-day has relation to the sentiment and the felt needs of to-day, and that, if not ratified early while that sentiment may fairly be supposed to exist, it ought to be regarded as waived, and not again to be voted upon, unless a second time proposed by Congress.

*Id.* § 585, at 634, *quoted in part in* 256 U.S. at 375.

Contrary to the conclusion in *Dillon*, however, Jameson in his treatise had not suggested that his "opinion" on the need for contemporaneous ratification was based on any requirement detectable in the text of Article V. Rather, he believed that securing this policy goal would require the adoption of a "constitutional statute of limitation" for proposed amendments. Jameson specifically referred to the

Continued

In *Coleman v. Miller*, the Court was presented with a claim by members of the Kansas Legislature that the Child Labor Amendment, proposed by Congress thirteen years before, "had lost its vitality through lapse of time." 307 U.S. at 451. The Court refused to consider the claim. *Id.* at 452-56 (opinion of Hughes, C.J., joined by Stone and Reed, JJ.); *id.* at 456-60 (Black, J., joined by Roberts, Frankfurter and Douglas, JJ., concurring). In his "opinion for the Court" in *Coleman*, Chief Justice Hughes observed that although the three considerations outlined in *Dillon* represented "cogent reasons" for concluding in the earlier case that Congress had the power to fix a reasonable time limit for ratification, *Dillon*'s discussion of these considerations was merely a dictum. *Id.* at 452-53. Nevertheless, in determining that the issue was "political," Chief Justice Hughes in dicta adhered to the premise of *Dillon* that Article V may be read as implicitly limiting the time for ratification. *See id.* at 453-54. *See also* CRS Memorandum at 3; Staff of House Comm. on the Judiciary, 85th Cong., 1st Sess., *Problems Relating to a Federal Constitutional Convention* 44-45 (Comm. Print 1957) (by Cyril F. Brickfield).[9]

2.

*Dillon* is not authoritative on the issue whether Article V requires contemporaneous ratification. As Chief Justice Hughes pointed out in *Coleman*, 307 U.S. at 452-53, the "reasonable time" discussion in *Dillon* was dictum because the issue before the Court was Congress's authority to limit the period for ratification, not a State's authority to ratify a long-dormant proposed amendment. *See* 1 Westel W. Willoughby, *The Constitutional Law of the United States* 596 n.18 (2d ed. 1929) ("Willoughby") ("[T]he declaration of the court [in *Dillon*] as to the lapsing of proposed amendments which do

---

[8] (....continued)
various proposed amendments "floating about" in 1887, including the Congressional Pay Amendment, which had shortly before been ratified by Ohio, and he acknowledged that "there is in force in regard to them no recognized statute of limitation." Jameson, *supra*, § 586, at 635-36. After discussing the hypothetical "confusion or conflict" that would result from such open-ended proposals, Jameson concluded with a plea for amending the amendment process:

> We discuss this question here merely to emphasize the dangers involved in the Constitution *as it stands*, and to show the necessity of legislation to make certain those points upon which doubts may arise in the employment of the constitutional process for amending the fundamental law of the nation. A constitutional *statute of limitation, prescribing the time within* which proposed amendments shall be adopted or be treated as waived, *ought by all means to be passed.*

*Id.* at 635-36 (emphases added). *See also* Herman V. Ames, *The Proposed Amendments to the Constitution of the United States During the First Century of Its History*, H.R. Doc. No. 353, 54th Cong., 2d Sess., pt. 2, at 291-92 & n.1 (1897).

[9] Chief Justice Hughes wrote that "the question of a reasonable time in many cases would involve . . . an appraisal of a great variety of relevant conditions, political, social and economic." 307 U.S. at 453. The four concurring Justices would have dismissed the case for lack of standing, *see id.* at 460-70 (opinion of Frankfurter, J.), but concurred in the Chief Justice's conclusion on the broader ground that "Congress has sole and complete control over the amending process, subject to no judicial review." *Id.* at 459 (Black, J., concurring). Justices Butler and McReynolds in dissent found the issue justiciable and concluded that under *Dillon* "more than a reasonable time had elapsed" for ratification of the Child Labor Amendment. *Id.* at 473 (Butler, J. dissenting). We discuss *Coleman*'s political question holding in Part II, *infra*.

not receive ratification by the States within a reasonable period of time was *obiter*, inasmuch as this question was not before the court in the instant case."); *see also* Brief for the United States Amicus Curiae at 25, *Coleman v. Miller*, 307 U.S. 433 (1939) (No. 38-7) ("It was unnecessary in [*Dillon*] to consider whether a proposed amendment would expire with the passage of time in the absence of [a limitation] provision . . . .").[10]

Nor is *Coleman* authoritative as to contemporaneity. The *Coleman* Court's discussion of *Dillon*'s "reasonable time" inference was simply not part of its holding. Although Chief Justice Hughes's opinion for three members of the Court did approve of the "cogent reasons" for requiring contemporaneity outlined in *Dillon*, *see* 307 U.S. at 452-53, the four remaining Justices comprising the seven-vote majority on the dispositive "political question" issue specifically repudiated *Dillon*. The four concurring Justices called for "disapproval of the conclusion arrived at in *Dillon v. Gloss*, that the Constitution impliedly require[d] that a properly submitted amendment must die unless ratified within a 'reasonable time.'" *Id.* at 458 (Black, J., concurring) (footnote omitted).[11] Moreover, Chief Justice Hughes's conclusion does not logically imply that *Dillon* was correct. Having declined to address the content of an implicit time limit, it leaves open for Congress the conclusion that there is no time limit at all.

3.

On its merits, the reasoning of *Dillon* is unpersuasive in both its specific arguments and in its broader methodology. The *Dillon* Court's first

---

[10] Indeed, some have argued that the entire opinion of the Court in *Dillon* was a dictum and must be considered "dubious" authority at best. *See* Note, *The Process of Constitutional Amendment*, 79 Colum. L. Rev. 106, 126 n.75 (1979); Ernst Freund, *Legislative Problems and Solutions*, 7 A.B.A. J. 656, 656-57 (1921). The challenge to the Eighteenth Amendment in *Dillon* was baseless because the seven-year limitation at issue was part of the text of the amendment and was therefore itself ratified by the States; the petitioner did not claim that Congress lacked authority to include such a limitation in the amendment itself. Note, 79 Colum. L. Rev. at 126 n.75. *See* Brief for Appellee at 5, *Dillon v. Gloss*, 256 U.S. 368 (1921) (No. 20-251) ("The amendment having been ratified by the requisite number of States within the time limitation provided in section three, it is unimportant whether that section is valid or invalid."). "[T]he Supreme Court, apparently mistaking the actual facts of the case submitted to it, stated and decided the case as though the time limit for ratification had been contained . . . in the Joint Resolution of Congress . . . ." Willoughby, at 596-97.

[11] We do not believe that Chief Justice Hughes's opinion must be treated as a holding of the Court because it rested on a "narrower ground" than Justice Black's. Ordinarily, where an opinion for the Court is fragmented, as in *Coleman*, the opinion of the Justices concurring in the judgment on the narrowest grounds is regarded as the Court's holding. *See Marks v. United States*, 430 U.S. 188, 193 (1977); *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976) (opinion of Stewart, Powell and Stevens, JJ.); *King v. Palmer*, 950 F.2d 771, 778 (D.C. Cir. 1991) (Silberman, J., concurring), *cert. denied*, 550 U.S. 1229 (1992). However, "the narrowest opinion must represent a common denominator of the Court's reasoning; it must embody a position implicitly approved by at least five Justices who support the judgment." *King*, 950 F.2d at 781. The "reasonable time" rule thus cannot be considered a holding of *Coleman* because it was specifically rejected by four concurring Justices. *Coleman* "is not a case in which the concurrence [here the three-justice Hughes faction] posits a narrow test to which the plurality must necessarily agree as a logical consequence of its own, broader position." *Id.* at 782. "In other words, it is not a case in which there is an implicit majority of the court" on the issue whether Article V requires reasonably contemporaneous ratification. *Id.*

consideration was that proposal and ratification are steps in a single process and hence should not be widely separate in time. This argument simply assumes its conclusion — that the process is to be short rather than lengthy.

Second, *Dillon* argued that because amendments are to be proposed only when needed, the implication is that they should be dealt with promptly. But necessity is not the same as emergency. Thus, Story has written:

> The guards [in Article V] against the too hasty exercise of the [amendment] power, under temporary discontents or excitements, are apparently sufficient. Two thirds of congress, or of the legislatures of the states, must concur in proposing, or requiring amendments to be proposed; and three fourths of the states must ratify them. Time is thus allowed, and ample time, for deliberation, both in proposing and ratifying amendments. They cannot be carried by surprise, or intrigue, or artifice. Indeed, years may elapse before a deliberate judgment may be passed upon them, unless some pressing emergency calls for instant action. . . .
>
> . . . The mode, both of originating and ratifying amendments . . . must necessarily be attended with such obstacles and delays, as must prove a sufficient bar against light or frequent innovations.

*Commentaries*, §§ 959-960, at 681-82. The States that have ratified the Congressional Pay Amendment only recently evidently consider it to be just as necessary today as the first Congress presumably thought it was in 1789.

Finally, *Dillon* suggests that Article V is designed to seek consensus, and that consensus must be contemporaneous. Again, even assuming that it is proper to interpolate terms into a constitutional provision in order to serve its purported end — a question we address below — this reasoning is faulty. Consensus does not demand contemporaneity. The sort of lasting consensus that is particularly suitable for constitutional amendments may just as well be served by a process that allows for extended deliberation in the various states. There have been occasions when it has taken decades to build the consensus within Congress needed for a two-thirds vote on a proposed amendment.[12] In the absence of a time limit in the original amendment proposal, it

---

[12] *See, e.g.*, Senate Hearings, at 134-35 (statement of Professor Thomas I. Emerson) ("History has demonstrated that a long period of time is necessary for the nation to make up its mind with respect to fundamental changes . . . . Thus the Women's Suffrage Amendment was under consideration for nearly three quarters of a century.").

would appear to be equally true that it may legitimately take many decades to build the three-fourths consensus required for the states' approbation.[13]

More fundamentally, *Dillon* rests on a faulty approach to the interpretation of the Constitution, and in particular those provisions that determine the structure of government. The amendment procedure, in order to function effectively, must provide a clear rule that is capable of mechanical application, without any need to inquire into the timeliness or substantive validity of the consensus achieved by means of the ratification process. Accordingly, any interpretation that would introduce confusion must be disfavored. As the Supreme Court has explained, the Constitution is designed to provide "[e]xplicit and unambiguous provisions" to govern the structure of government. *INS v. Chadha*, 462 U.S. 919, 945 (1983) (construing the presentment and bicameralism provisions of Article I). The very functioning of the government would be clouded if Article V, which governs the fundamental process of constitutional change, consisted of "open-ended" principles without fixed applications. The alternative to procedural formalism is uncertainty and litigation.[14]

As explained above, the terms of Article V provide a clear rule: any amendment once proposed "shall be valid to all Intents and Purposes, as part of this Constitution, when ratified by the Legislatures of three-fourths of the several States." The reading according to which Article V contains an implicit time limit, by contrast, introduces so much uncertainty as to make the ratification process unworkable. The two stages of the amendment process are proposal and ratification. The latter is done by states acting through legislatures or conventions. In order to be able to carry out its function in the ratification process, any state that is contemplating ratification must know whether an amendment is in fact pending before it. That is not a matter of degree; the proposed amendment is either pending or not.

---

[13] It is conceivable that the goal of consensus, if there is one, could be defeated where the last State to ratify harbors an entirely different intent or purpose in approving the amendment than did the first ratifying States or the proposing Congress. Thus, for example, the meaning of the words of an amendment chosen by the proposing Congress could conceivably change dramatically with the passage of time. If there is a substantive consensus requirement beyond the procedural formalities of Article V, this hypothetical case might be taken to violate that substantive meaning. That, however, is plainly not the case with the Congressional Pay Amendment. The intent and purpose behind this amendment have been consistent from its proposal by Madison to its recent ratification. We, therefore, express no opinion on any hypothetical scenario that may present a more fundamental challenge to the notion of consensus. We conclude only that consensus itself does not necessarily require contemporaneity. Moreover, of course, if the absence of a time limit introduces a danger into the Article V amendment process, the solution is to specify a time limit, either in the text of the amendment or the proposing resolution.

[14] *See* Walter Dellinger, *The Legitimacy of Constitutional Change: Rethinking the Amendment Process*, 97 Harv. L. Rev. 386, 418 (1983) ("Dellinger"): "Attention to th[e] formalities [specified in Article V] is more likely to provide clear answers than is a search for the result that best advances an imputed 'policy' of 'contemporaneous consensus.'" Professor Dellinger nevertheless maintains that a proposed amendment, like the Congressional Pay Amendment, that languishes for years without action by state legislatures could be considered dead. *Id.* at 425. Dellinger's "doctrine of desuetude," however, has itself been criticized as "an anomolous position" in light of his reliance on the formalities of Article V. John R. Vile, *Judicial Review of the Amending Process: The Dellinger-Tribe Debate*, 3 J.L. & Pol. 21, 33 (1986). *See also* Laurence H. Tribe, *A Constitution We Are Amending: In Defense of a Restrained Judicial Role*, 97 Harv. L. Rev. 433, 434 n.6 (1983). In our view, the notion of desuetude is fraught with all of the shortcomings that characterize the "reasonable time" rule of *Dillon* and must be rejected for the same reasons.

According to the theory that Article V contains an implicit time limit, the State must deduce that it can ratify only if the time since proposal is still a reasonable one. The implicit reasonable time rule can take one of two forms. First, the Constitution might be said to impose the same time period with respect to all proposed amendments. Putting aside the implausibility of the suggestion that a legal rule includes a time certain without stating it, this reading would require each state somehow to decide for itself what limitation the Constitution implicitly imposes. This question is extremely difficult, and there is no reason to believe that the different States would answer it in the same way.[15] In fact, the long history of congressional treatment of time limits demonstrates that there is no agreement as to what period of time would be reasonable.[16]

The other possible form of the implicit time limit rule is that the "reasonable" time differs from amendment to amendment, depending on any number of unstated factors. This theory requires that the States undertake an inquiry even more difficult than the search for an implicit but specific time limit. To take an example, this approach may suggest that the merits of a proposal may affect the question whether it is still pending, because one approach to judging the reasonableness of the period of ratification is to ask if the problem the amendment was designed to address is still pressing — a question that is inseparable from the substance of the amendment. However the question of reasonableness is to be answered, it is plain that answering it can be extremely difficult, and that expecting all the States to answer it in the same way is unreasonable.

The implicit time limit theory thus imposes an impossibly burdensome requirement on ratifying States — that they discern the implicit limitation and, if the system is to work smoothly, that they all discern the same one. Most discussions of the implicit time limit obscure this difficulty by shifting attention away from the situation of the States. For instance, Chief Justice Hughes's opinion in *Coleman* indicates that the reasonableness of the period that has passed since proposal is for Congress to decide at the time of promulgation. *See* 307 U.S. at 454. Congress's decision at the end of the

---

[15] The compelling need for regularity and certainty in the amendment procedure is exactly what prompted Congress to include a time limit in the Eighteenth Amendment, which led the Court in *Dillon* to consider the question"[w]hether a *definite* period for ratification shall be fixed so that all may know what it is *and speculation on what is a reasonable time may be avoided.*" 256 U.S. at 376 (emphases added).

[16] What seems to have been the first attempt to impose a time limit on the States occurred during congressional consideration of the Fourteenth Amendment, when Senator Buckalew proposed an amendment to the joint resolution that would have required ratification within *three years*. Cong. Globe, 39th Cong., 1st Sess. 2771 (1866). In 1917, during debates on the Eighteenth Amendment, Senator Ashurst stated that he could support a time limit of "10, 12, 14, 16, 18, or even 20 years." 55 Cong. Rec. 5557 (1917). Senator Harding proposed an amendment to the joint resolution that would have limited states' consideration to a period of *six years*. Senator Cummins offered a substitute amendment that would have amended Article V to require state ratification of all amendments proposed after January 1, 1917, to *eight years*, expressing the view that what is a "reasonable" period for ratification might differ in each case. 55 Cong. Rec. 5652 (1917). During debate on the Child Labor Amendment in 1924, Representative Linthicum and Senator Fletcher offered amendments that would have required ratification within *five years* of proposal. 65 Cong. Rec. 7288, 10,141 (1924).

process, however, can be of no use to States while that process is going on. According to Chief Justice Hughes's approach, the States must make decisions concerning constitutional amendments without knowing whether those decisions matter until they learn from Congress at some later date, if ever.[17] The implicit time limit thesis is thus deeply implausible, because it introduces hopeless uncertainty into that part of the Constitution that must function with a maximum of formal clarity if it is to function.

In sum, the dictum of *Dillon* and the view of Chief Justice Hughes's plurality in *Coleman* are not authoritative nor are they persuasive. Article V contains no time limit not stated in its text. The Congressional Pay Amendment — rather, the Twenty-Seventh Amendment — although well aged, is not stale.[18]

## II.

You have also asked whether, under 1 U.S.C. § 106b, the Archivist was required to publish the Congressional Pay Amendment along with his certificate specifying that the Amendment has become valid, to all intents and purposes, as part of the Constitution. We believe that he was required to do so.

### A.

Section 106b provides:

> Whenever official notice is received at the National Archives and Records Administration that any amendment proposed to the Constitution of the United States has been adopted, according to the provisions of the Constitution, the Archivist of the United States shall forthwith cause the amendment to be published, with his certificate, specifying the States by which the same may have been adopted, and that the same has become valid, to all intents and purposes, as a part of the Constitution of the United States.

---

[17] *See* Note, *Critical Details: Amending the United States Constitution,* 16 Harv. J. on Legis. 763, 767 (1979) ("Although *Coleman* did spell out some guidelines, the state legislatures would still only speculate about what amount of time Congress would conclude was reasonable. Only some direct signal from Congress before or during ratification would definitely prescribe the time for action in the states."). *See also* 2 David K. Watson, *The Constitution of the United States* 1311-12 (1910) ("Who but the state can judge of what would be a reasonable time? It is for the state to ratify and cannot the state take its own time to do it?"), *quoted in Case Note,* 24 Minn. L. Rev. 393, 394 n.9 (1940).

[18] Several other amendments to the Constitution have been proposed to the States without time limits and have never received the approval of three-fourths of the States. *See Constitution Annotated,* at 51-53. A resolution was introduced in the Senate purporting to declare that those proposals have "expired," but it was not passed. *See* S. Con. Res. 121, 102d Cong., 2d Sess. (1992); 138 Cong. Rec. S6839, S6908 (daily ed. May 19, 1992). *But see* 138 Cong Rec. S6949 (daily ed. May 2, 1992) (Senator Sanford asserting that "today the Senate also decided to declare that four other proposed and pending amendments . . . were to be considered to have lapsed"). This opinion does not address the current vitality of any of those amendments. We note, however, that the status of the amendment proposed in 1861 providing that "[n]o amendment shall be made to the Constitution which will authorize or give Congress the power to abolish or interfere, within any State, with the domestic institutions thereof, including that of persons held to labor or service by the laws of said State," *Constitution Annotated* at 52, may be determined by the subsequent adoption of the Thirteenth Amendment.

97

1 U.S.C. § 106b. The statutory directive is clear. First, the Archivist must determine whether, as a matter of law, he has received "official notice" of an amendment's adoption "according to the provisions of the Constitution." *Id.* If he determines that he has received such notice, he must publish the amendment with a certificate specifying, inter alia, that the amendment "has become valid, to all intents and purposes, as a part of the Constitution." *Id.* The statute allows the Archivist no discretion in this regard.

Congress has required the executive branch to certify the validity of constitutional amendments since 1818. In that year, Congress established a statutory mechanism for the publication of constitutional amendments as part of a general provision "for the publication of the laws":

> [W]henever official notice shall have been received, at the Department of State, that any amendment which heretofore has been, or hereafter may be, proposed to the constitution of the United States, has been adopted, according to the provisions of the constitution, it shall be the duty of the said Secretary of State forthwith to cause the said amendment to be published in the . . . newspapers authorized to promulgate the laws, with his certificate, specifying the states by which the same may have been adopted, and that the same has become valid, to all intents and purposes, as a part of the constitution of the United States.

Act of Apr. 20, 1818, ch. 80, § 2, 3 Stat. 439. Over time, Congress deleted the reference to newspapers and transferred the duty of publication from the Secretary of State, first to the Administrator of General Services, *see* Act of Oct. 31, 1951, ch. 655, § 2(b), 65 Stat. 710 (1951); Reorg. Plan No. 20 of 1950, § 1(c), 64 Stat. 1272, and then to the Archivist, *see* National Archives and Records Administration Act of 1984, Pub. L. No. 98-497, § 107, 98 Stat. 2280, 2291 (1984). The substance of the statutory directive, however, has remained the same.

Section 106b and its antecedents have long been understood as imposing a ministerial, "record-keeping" duty upon the executive branch. *See* 96 Cong. Rec. 3250 (Message from President Truman accompanying Reorg. Plan No. 20 of 1950); Judith L. Elder, *Article V, Justiciability, and the Equal Rights Amendment*, 31 Okla. L. Rev. 63, 75-76 (1978). The Archivist may not refuse to certify a valid amendment. *See United States ex rel. Widenmann v. Colby*, 265 F. 998, 999 (D.C. Cir. 1920) (no discretion to refuse publication once official notice received, as publication is merely "ministerial act"), *aff'd mem. sub. nom. U.S. ex rel. Widenmann v. Hughes*, 257 U.S. 619 (1921); *United States v. Sitka*, 666 F. Supp. 19, 22 (D. Conn. 1987), *aff'd*, 845 F.2d

43 (2d Cir.), *cert. denied*, 488 U.S. 827 (1988).[19]  Nonetheless, section 106b clearly requires that, before performing this ministerial function, the Archivist must determine whether he has received "official notice" that an amendment has been adopted "according to the provisions of the Constitution."  This is a question of law that the Archivist may properly submit to the Attorney General for resolution.  *See* 28 U.S.C. § 511 ("The Attorney General shall give his advice and opinion on questions of law when required by the President.").[20]

## B.

As we concluded above, the Congressional Pay Amendment has been adopted in accordance with the Constitution.  The only obstacle to the Archivist's promulgation of the amendment would be the thesis, advanced by some commentators, that under *Coleman v. Miller*, 307 U.S. 433 (1939), Congress alone among the branches may determine whether an amendment has been constitutionally adopted.  Under this theory, the Archivist must wait for a determination of the matter by Congress or, at most, issue a "conditional certification" of an amendment in deference to possible congressional action.  We believe that *Coleman* is not authority for this theory, and that congressional promulgation is neither required by Article V nor consistent with constitutional practice.  As a consequence, we believe that the Archivist was not required to wait for a congressional promulgation to certify the Congressional Pay Amendment as valid.

### 1.

In *Coleman*, the Court considered the validity of the  ratification by Kansas of the Child Labor Amendment, proposed by Congress in 1924.  307 U.S. at 435-36.  Members of the Kansas Legislature had brought a state-court action alleging that the Kansas ratification had been invalid because, inter alia, the State Legislature had ratified the amendment some thirteen years after Congress had proposed it.  Congress had not imposed a time-limit on ratification

---

[19] Indeed, there is authority for the proposition that the Archivist's Certificate is not necessary to an amendment's validity.  The text of Article V contains no such requirement.  *See also Dillon v. Gloss*, 256 U.S. 368, 376 (1921) (Eighteenth Amendment became valid on the date it received its final ratification; the date of publication was "not material, for the date of [an amendment's] consummation, and not that on which it is proclaimed, controls.").

[20] Others have recognized the Attorney General's role in resolving such legal questions.  Concerning the validity of ratifications of the Equal Rights Amendment, Professor Dellinger questioned why the Administrator of General Services, at that time the official responsible for certifying new amendments, would submit the question to Congress: "An administrator uncertain about the lawful exercise of one of her responsibilities is normally expected to refer the question to the Attorney General for an opinion and then act in accordance with that opinion."  97 Harv. L. Rev. at 402.  That was exactly what the administrator at the time intended to do.  Asked what would be done if the requisite number of states had ratified but some States had purported to rescind their ratifications, the Deputy Archivist stated that "we would call upon the Attorney General to determine the answer to the legal question on rescission."  Senate Hearings, at 109 (testimony of James E. O'Neill).

when it had proposed the amendment to the States. The Supreme Court of Kansas held that the amendment remained susceptible to adoption despite the thirteen-year delay, and dismissed the suit. *Id.* at 437.

The Supreme Court of the United States reversed. There was no majority opinion on the validity of the Kansas ratification. Three Justices — Chief Justice Hughes, Justice Stone, and Justice Reed — determined that the question whether Kansas had ratified within a "reasonable time" was a nonjusticiable political question. Chief Justice Hughes asserted that the resolution of such a question would depend on social, political, and economic conditions that courts were incompetent to address. *Id.* at 453-54. "On the other hand," he reasoned, "these conditions [were] appropriate for the consideration of the political departments of the Government." *Id.* at 454. The Hughes opinion concluded that the question whether an amendment had lapsed should "be regarded as an open one for the consideration of the Congress when, in the presence of certified ratifications by three-fourths of the States, the time arrives for the promulgation of the adoption of the amendment." *Id.*

Four Justices — Justice Black, joined by Justices Roberts, Frankfurter, and Douglas — went even further. They disclaimed *any* judicial review of a congressional determination as to the adoption of an amendment. "[U]ndivided control of [the amendment] process had been given by [Article V] exclusively and completely to Congress," Justice Black wrote. *Id.* at 459 (Black, J., concurring). "Therefore, any judicial expression amounting to more than mere acknowledgement of exclusive Congressional power over the political process of amendment is a mere admonition to the Congress in the nature of an advisory opinion, given wholly without constitutional authority." *Id.* at 459-60. Two Justices — Justices Butler and McReynolds — dissented on the ground that the amendment was invalid because of the thirteen-year delay. *Id.* at 473-74 (Butler, J., dissenting).

Neither Chief Justice Hughes nor Justice Black explained the constitutional basis for the assertion that Congress had authority to "promulgate" an amendment. Rather, Chief Justice Hughes relied on the "special circumstances" surrounding the adoption of the Fourteenth Amendment in 1868. *Id.* at 449-50.[21] At that time, as we have seen, the duty of publication of constitutional amendments rested with the Secretary of State. Because of irregularities in the ratifications of Ohio and New Jersey — the legislatures of both States had attempted to rescind their earlier votes to approve the amendment — Secretary Seward issued a "conditional certification" of the Fourteenth Amendment on July 20, 1868. Proclamation No. 11, 15 Stat. 706 (1868). Secretary Seward certified that *if* the resolutions of Ohio and New Jersey were still effectual, notwithstanding the subsequent attempts to rescind, "then the . . . amendment . . . ha[d] become valid, to all intents and

---

[21] Justice Black provided no support for his assertion.

purposes, as a part of the Constitution." *Id.* at 707. Secretary Seward disclaimed any authority to resolve the matter himself. *Id.*

The next day, Congress passed a concurrent resolution declaring the Fourteenth Amendment to be a part of the Constitution and directing Secretary Seward to promulgate it as such. Cong. Globe, 40th Cong., 2d Sess. 4266, 4295-96 (1868). The Senate passed the resolution without any debate, *id.* at 4266, and in the House the only question was whether Georgia, of whose ratification the Speaker had received notice by telegraph, should be included on the list of ratifying States. *Id.* at 4295-96. One week later, on July 28, 1868, Secretary Seward issued a second proclamation, "in execution of" the concurrent resolution and "in conformance thereto," certifying the Fourteenth Amendment as valid. Proclamation No. 13, 15 Stat. 710 (1868).

"Thus," observed Chief Justice Hughes, in the case of the Fourteenth Amendment "the political departments of the Government dealt" with questions concerning the ratification of the amendment. *Coleman,* 307 U.S. at 449. He apparently used the events surrounding the adoption of the Fourteenth Amendment as a model and simply assumed that, if and when the issue arose with respect to the Child Labor Amendment, the same procedures would obtain. *See id.* at 454 ("The [eventual] decision by the Congress, in its control of the action of the Secretary of State, of the question whether the [Child Labor Amendment] had been adopted within a reasonable time would not be subject to review by the courts."). The plurality opinion did not address the question whether, in the event the Secretary of State decided to certify the amendment on his own, congressional promulgation would still be necessary. Indeed, given the posture of the case, the Justices could not have addressed that question: the Child Labor Amendment was nowhere near ratification, and circumstances had not required the Secretary to make any decision regarding the validity of the amendment.[22]

Chief Justice Hughes's opinion is thus best understood as resting on a political question rationale: courts will not attempt to resolve certain questions concerning the validity of states' ratifications of constitutional amendments. Rather, the decision of the political branches will control. To read the Hughes opinion as addressing the relationship between the political branches and *requiring* the Executive to defer to Congress on the adoption of an amendment would be to resolve an issue that was not before the *Coleman* Court. As it was, the *Coleman* dissenters took their brethren to task for even addressing the role of Congress in the amendment process. The Court had not heard argument on that point, they protested; Congress's role had not been "raised by the parties or by the United States appearing as *amicus curiae.*" 307 U.S. at 474 (Butler, J., dissenting). At most, *Coleman* stands for the proposition that the validity of a constitutional amendment is

---

[22] The Hughes opinion endorsed the Court's earlier holding in *Leser v. Garnett,* 258 U.S. 130, 137 (1922), that the Secretary would be bound by official notice from a state respecting its ratification. *See Coleman,* 307 U.S. at 451.

a political question. That proposition has no bearing on the actions of the Archivist, an officer of one of the political branches.[23]

2.

On its merits, the notion of congressional promulgation is inconsistent with both the text of Article V of the Constitution and with the bulk of past practice.[24] Article V clearly delimits Congress's role in the amendment process. It authorizes Congress to propose amendments and specify their mode of ratification, and requires Congress, on the application of the legislatures of two-thirds of the States, to call a convention for the proposing of amendments. Nothing in Article V suggests that Congress has any further role. Indeed, the language of Article V strongly suggests the opposite: it provides that, once proposed, amendments "*shall be valid* to all Intents and Purposes, as Part of this Constitution, when ratified by" three-fourths of the States. (Emphasis added.) As Professor Dellinger has written, the Constitution "requires no additional action by Congress or by anyone else after ratification by the final state." 97 Harv. L. Rev. at 398. To interpret Article V "as requiring or permitting" a further step of congressional promulgation is, in the words of another scholar, "no more defensible than to find a third house of Congress hidden cleverly in the interstices of the constitutional language vesting all legislative power in a House and a Senate." Rees *supra*, at 899.

---

[23] We have discussed Chief Justice Hughes's opinion because it is the only part of *Coleman* other than the judgment that might be considered authoritative. If the views of the majority Justices had any common ground, Chief Justice Hughes's occupied the narrowest portion of that ground: Justice Black's disclaimer of any judicial inquiry is broader than the Chief Justice's approach. Scholars doubt whether *Coleman* has authority even as a political question decision. Grover Rees III, *Throwing Away the Key: The Unconstitutionality of the Equal Rights Amendment Extension*, 58 Tex. L. Rev. 875, 887-88 (1980) ("Rees"); Dellinger, at 388 n.8. *See also AFL-CIO v. March Fong Eu*, 686 P.2d 609, 616 (Cal. 1984) Indeed, Chief Justice Rehnquist has questioned whether *Coleman's* analysis still obtains in the context of Article V. *See Uhler v. AFL-CIO*, 468 U.S. 1310 (1984) (Rehnquist, Circuit Justice); *but cf. Goldwater v. Carter*, 444 U.S. 996, 1002 (1979) (Rehnquist, J., concurring) (relying on *Coleman* to conclude that President's power to denounce a treaty was a nonjusticiable political question).

[24] In 1977, this Office stated that Congress could by concurrent resolution extend the time-limit for ratification of the Equal Rights Amendment. *See* Memorandum for Robert J. Lipshutz, Counsel to the President, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel (Oct. 31, 1977) ("October Memorandum"). *See also Extending the Ratification Period for the Proposed Equal Rights Amendment: Hearings on H.J. Res. 638 Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary*, 95th Cong., 1st Sess. 5-7 (1977) (statement of John M. Harmon, Assistant Attorney General, Office of Legal Counsel); Senate Hearings, *supra*, note 6. Relying on *Coleman*, this Office further concluded that Congress has the exclusive power to determine whether an amendment has been timely adopted. *See* October Memorandum at 17, 20-21, 43. *See also Power of a State Legislature to Rescind its Ratification of a Constitutional Amendment*, 1 Op. O.L.C. 13 (1977). In an aside, we specifically referred to the Congressional Pay Amendment and noted our view that if and when the thirty-eighth ratification was received, Congress would have the duty to decide whether too much time had passed for the Amendment to be viable. *See* October Memorandum at 21 & n.26; *see also id.* at 35 n.43 (Congress may determine whether an amendment has been adopted by concurrent resolution). Those opinions arose in a factual setting quite different from the instant case. The "reproposal" of a constitutional amendment may be an exclusively congressional function in a way that the certification of a ratified amendment is not. *See Hollingsworth v. Virginia*, 3 U.S. 378 (1798) (thought to stand for the proposition that the President's signature is not needed for proposal of an amendment). To the extent that our earlier opinions suggest that Congress alone must make the determination of the adoption of a constitutional amendment, we reject them today.

102

In light of the overall structure of the Constitution, it would be surprising if Article V did confer such exclusive power on Congress. The fundamental features of the American constitutional system -- federalism and separation of powers — produce a division of power designed to ensure that the people, rather than any organ of the government, are sovereign. As Attorney General Edward Bates explained in 1861, the Framers of the Constitution rejected the notion that "Parliament is omnipotent." *See* 10 Op. Att'y Gen. 74, 75 (1861). Instead, the federal government "is not vested with the sovereignty, and does not possess all the powers of the nation. It has no powers but such as are granted by the Constitution." *Id.* at 77. The same principle undergirds the separation of powers: the three branches of the federal government "are co-ordinate and coequal — that is, neither being sovereign, each is independent in its sphere, and not subordinate to the others." *Id.* at 76. To give one branch of government ultimate control over the Constitution's very content would be to repudiate the American approach in favor of a return to parliamentary supremacy. Article V, however, shows that the Constitution is consistent in its rejection of governmental sovereignty.

The drafting history of Article V reaffirms this conclusion. The Federal Convention designed the amendment system so that both Congress and the states played important roles. At the convention, the Framers manifested a marked distrust of Congress in the amendment process. An early outline of the Constitution specified that the Constitution could be amended "without requiring the assent of the Natl. Legislature." 1 *Records Federal Convention of 1787* 121 (Max Farrand, ed., revised ed. 1966). In supporting that provision, George Mason argued: "It would be improper to require the consent of the Natl. Legislature, because they may abuse their power, and refuse their consent on that very account." *Id.* at 203.[25] Mason reaffirmed his concern in the final days of the convention and argued that Article V gave Congress too much power and ability to abuse the process. 2 *Records of the Federal Convention of 1787* 629 (Max Farrand, ed., revised ed. 1966). Article V was specifically altered by the convention to accommodate Mason's concern. *Id.*

Commentary during the ratification debates bears out the Framers' intention to check the power of Congress in the amendment process. Madison explained in Federalist No. 39 that the amendment system balanced the States and the federal government, so that the system is "neither wholly federal, nor wholly national." *The Federalist* No. 39, at 257 (James Madison) (Jacob E. Cooke ed., 1961). In discussing the provisions for calling a convention upon the petition of two-thirds of the States, Alexander Hamilton states:

> [The amendments so proposed] *"shall be valid* to all intents and purposes, as part of the constitution, when ratified by the legislatures of three-fourths of the states, or by conventions in

---

[25] The Congressional Pay Amendment, dealing as it does with the power of members of Congress to increase their salaries, is just the sort of amendment to which Mason's comment would apply most readily.

three-fourths thereof." The words of this article are peremptory. The congress *"shall* call a convention." Nothing in this particular is left to the discretion of that body [Congress].

*The Federalist* No. 85, at 593 (Alexander Hamilton) (Jacob E. Cooke, ed., 1961). These words are equally applicable to ratification of an amendment by three-fourths of the States. Discussing Article V more generally, Hamilton concluded by observing that "[w]e may safely rely on the disposition of the state legislatures to erect barriers against the encroachments of the national authority." *Id.* These statements are inconsistent with the notion that Congress has a general power of superintendence over the amendment process.

Congressional promulgation is also at odds with the bulk of past practice in this area. As we have seen, Chief Justice Hughes in *Coleman* used the "special circumstances" surrounding the adoption of the Fourteenth Amendment as a model for the only instance of congressional involvement in the promulgation of an amendment following ratification in more than two hundred years. *See, e.g.,* Dellinger, at 400. There has never been another "conditional certification" of an amendment by the executive branch.[26] The concurrent resolution "promulgating" the Fourteenth Amendment, adopted with no substantive debate, was unnecessary and an aberration.

The events surrounding the adoption of the Fifteenth Amendment two years later demonstrate that fact.[27] Irregularities in State ratifications also plagued this Amendment — New York had attempted to rescind its ratification, *see* Cong. Globe, 41st Cong., 2d Sess. 1444 (1870), and two other States, Ohio and Georgia, ratified the amendment only after having rejected it once, *see* Memorandum to Don W. Wilson, Archivist of the United States, from Martha L. Girard, Director of the Federal Register 6 (May 22, 1991).

---

[26] *See* Letter to Governors of the Several States from Thomas Jefferson, Secretary of State (March 1, 1792), *reprinted in* 2 *The Bill of Rights: A Documentary History* 1203 (Bernard Schwartz, ed., 1971) (First through Tenth Amendments); President John Adams, Message to Congress, 7 Annals of Cong. 809 (1798) (Eleventh Amendment); Letter to Governors of the Several States from James Madison, Secretary of State (Sept. 25, 1804) (Twelfth Amendment), *cited in Constitution Annotated,* at 28 n.4; Certification by William H. Seward, Secretary of State, 13 Stat. 774 (1865) (Thirteenth Amendment); Certification of Hamilton Fish, Secretary of State, 16 Stat. 1131-32 (1870) (Fifteenth Amendment); Certification by Philander C. Knox, Secretary of State, Act of Feb. 25, 1913, 37 Stat. 1785 (1913) (Sixteenth Amendment); Certification by William Jennings Bryan, Secretary of State, Act of May 31, 1913, 38 Stat. 2049 (1913) (Seventeenth Amendment); Certification by Frank L. Polk, Acting Secretary of State, Act of Jan. 28, 1919, 40 Stat., "Eighteenth Amendment to the Constitution" 1 (1919); Certification by Bainbridge Colby, Secretary of State, Act of Aug. 26, 1920, 41 Stat. 1823 (1920) (Nineteenth Amendment); Certification by Henry L. Stimson, Secretary of State, Act of Feb. 6, 1933, 47 Stat. 2569 (1933) (Twentieth Amendment); Certification by William Phillips, Acting Secretary of State, Act of Dec. 5, 1933, 48 Stat. 1749 (1933) (Twenty-First Amendment); Certification by Jess Larson, Administrator of General Services, 16 Fed. Reg. 2019 (1951) (Twenty-Second Amendment); Certification by John L. Moore, Administrator of General Services, 26 Fed. Reg. 2808 (1961) (Twenty-Third Amendment); Certification by Bernard L. Boutin, Administrator of General Services, 29 Fed. Reg. 1715 (1964) (Twenty-Fourth Amendment); Certification by Lawson B. Knott, Administrator of General Services, 32 Fed. Reg. 3287 (1967) Twenty-Fifth Amendment), Certification by Robert L. Kunzig, Administrator of General Services, 36 Fed Reg. 12,725 (1971) (Twenty-Sixth Amendment).

[27] Chief Justice Hughes in *Coleman* briefly noted the events surrounding the ratification of the Fifteenth Amendment, but did not assign them any weight in this analysis. *See* 307 U.S. at 450 n.25.

104

On February 21, 1870, Senator Williams introduced a joint resolution declaring that the Amendment had become valid as part of the Constitution. Cong. Globe, 41st Cong., 2d Sess. 1444 (1870). Shortly thereafter, the Senate passed a different resolution requesting that the Secretary of State inform the Senate which States had ratified the Amendment. *Id.* at 1653.

On March 30, 1870, Secretary of State Hamilton Fish issued a proclamation certifying that the Fifteenth Amendment had become valid. The proclamation noted the attempted rescission by New York, but did not mention the questions regarding the Ohio and Georgia ratifications. 16 Stat. 1131 (1870). The Senate took no action in response to the proclamation, and Senator Williams allowed his earlier resolution to die. Cong. Globe, 41st Cong., 2d Sess. 3142 (1870). There was some debate in the House concerning the validity of the New York and Indiana ratifications, *id.* at 2298, but ultimately the House passed a resolution declaring that the Amendment had become a binding part of the Constitution. *Id.* at 5441.[28] At no time during the consideration of the Fifteenth Amendment did anyone in Congress suggest that congressional promulgation was essential to its validity. As the Fifteenth Amendment was adopted only two years after the Fourteenth, the absence of such a suggestion demonstrates that the congressional promulgation of the Fourteenth Amendment was merely an aberration.

If congressional promulgation is required, Secretary Fish illegally certified that the Fifteenth Amendment was part of the Constitution.[29] Indeed, the executive branch would have illegally certified every amendment except the Fourteenth.[30] If only to avoid this absurd conclusion, we must reject the assertion that only Congress may promulgate an amendment.

## III.

We conclude that the Congressional Pay Amendment has been validly ratified pursuant to the procedures set forth in Article V, and that the Archivist of the United States was required to promulgate the Twenty-Seventh Amendment pursuant to 1 U.S.C. § 106b.

TIMOTHY E. FLANIGAN
*Acting Assistant Attorney General*
*Office of Legal Counsel*

---

[28] The House Resolution also confirmed the validity of the Fourteenth Amendment. Cong. Globe, 41st Cong., 2d Sess. 5441 (1870).

[29] The experience of the Fifteenth Amendment also refutes a modified version of Justice Black's thesis, under which congressional certification would be required in doubtful cases. The status of the Fifteenth Amendment was as doubtful as that of the Fourteenth, and for the same reasons.

[30] Of course, the certifications would nevertheless be binding on the courts. *See Leser v. Garnett*, 258 U.S. 130 (1922); *United States v. Thomas*, 788 F.2d 1250, 1253 (7th Cir.) (Easterbrook, J.), *cert. denied*, 479 U.S. 853 (1986), *cf. Field v. Clark*, 143 U.S. 649, 669 (1892).

The Congressional Pay Amendment had its beginnings in the ratification conventions of States considering the original Constitution. Several States proposed amendments when they ratified the Constitution. Two of these, Virginia and New York, included a precedent to the Congressional Pay Amendment. 2 *The Bill of Rights: A Documentary History* 844, 916 (Bernard Schwartz, ed., 1971) ("Schwartz").[1] North Carolina proposed amendments on August 2, 1788, without at first ratifying the Constitution. *Id.* at 966, 977. Among the amendments it proposed was a congressional pay provision taken almost verbatim from Virginia's. *See id.* at 970-71. Representative James Madison included Virginia's proposal in the resolution of amendments he proposed to the House on June 8, 1789. 4 *Documentary History of the First Federal Congress of the United States of America* 9, 10 (Charlene Bangs Bickford and Helen E. Veit, eds., 1986) ("4 *First Congress*"). On the motion of Elbridge Gerry, the proposed amendments of several States, including New York's congressional pay proposal, were also put before the House. *Id.* at 4, 19, 24.

There was relatively little debate on the proposed Congressional Pay Amendment in Congress. Madison forecast that Congress's power over the compensation of its members was unlikely to be abused, but nevertheless pointed out the impropriety of giving members the power "to put their hand into the public coffers, to take out money to put in their pockets." 1 Annals of Cong. 457 (Gales & Seaton eds., 1789). Congressman John Vining later echoed this sentiment: "There was, to say the least of it, a disagreeable sensation, occasioned by leaving it in the breast of any man to set a value on his own work." *Id.* at 756-57. Another Congressman, however, thought that "much inconvenience and but very little good would result" from the amendment. *Id.* at 756 (statement of Theodore Sedgwick).

Congress approved the proposal of twelve amendments to the Constitution on September 25, 1789. The Congressional Pay Amendment was approved with only a minor change in wording made in the Senate. *See* 4 *First Congress*, at 44-46. As sent to the states for ratification, it read:

> No law, varying the compensation for the services of the Senators and Representatives, shall take effect, until an election of Representatives shall have intervened.

---

[1] Virginia ratified the Constitution on June 25, 1788, after narrowly defeating a motion to propose amendments prior to ratification. *See* Schwartz, at 834-39. Two days later, the convention proposed amendments, including: "That the laws ascertaining the compensation of senators and representatives for their services, be postponed, in their operation, until after the election of representatives immediately succeeding the passing thereof; that excepted which shall first be passed on the subject." *Id.* at 844. New York ratified the Constitution and proposed amendments on July 26, 1788. Among its proposed amendments was "That the Compensation for the Senators and Representatives be ascertained by standing Laws; and that no alteration of the existing rate of Compensation shall operate for the Benefit of the Representatives, until after a subsequent Election shall have been had." *Id.* at 916.

1 *Documentary History of the First Federal Congress of the United States of America* 208 (Linda Grant De Pauw, et al., eds., 1972) ("1 *First Congress*") (reproducing entry from Appendix to Senate Legislative Journal, 1st Cong., 1st Sess.). *Cf.* Act of Sept. 23, 1789, ch. 27, 1 Stat. 97 (1789). The proposed amendments were transmitted to the eleven States that had ratified the Constitution, as well as to North Carolina and Rhode Island. *See* 4 *First Congress*, at 9, 48.

When the amendments were proposed, nine States constituted the three-fourths necessary for ratification of the amendments. Before any States had acted on the amendments, North Carolina ratified the Constitution; nine States still constituted three-fourths. *The Bill of Rights and the States: The Colonial and Revolutionary Origins of American Liberties* xxi (Patrick T. Conley and John P Kaminski, eds., 1992) ("*Bill of Rights and the States*"). The Congressional Pay Amendment had been ratified by only four States before Rhode Island ratified the Constitution on May 29, 1790, bringing the number of States in the Union to 13, three-fourths of which was ten. Before any more States ratified the amendment, Vermont joined the Union, bringing the total to 14, three-fourths of which was eleven. Regardless of the time at which the "three-fourths" requirement was determined, however, the Congressional Pay Amendment was never close to that total in its initial period. It received only two more ratifications in 1791, for a total of six.[2]

Thomas Jefferson, as Secretary of State under George Washington, was responsible for monitoring the States' actions on the proposed amendments. *Id.* at xxii. His tally shows that of the thirteen original States and Vermont, six ratified the amendment. *Id.* at xxiii (photographic reproduction of Jefferson's tally). Five States rejected the amendment, three of them "silently," meaning that the ratification documents made no reference to the Congressional Pay Amendment. *Id.* at xxii-xxiii. The other three States did not respond: Massachusetts, Connecticut, and Georgia. *Id.*

The six States that ratified the Congressional Pay Amendment along with what is now the Bill of Rights are:

o    Maryland, December 19, 1789. 1 *First Congress*, at 349-50 (reproducing entry in Senate Journal of June 14, 1790).

o    North Carolina, December 22, 1789. 1 *First Congress*, at 346-47 (reproducing entry in Senate Journal of June 11, 1790).

o    South Carolina, January 28, 1790, 1 *First Congress*, at 275-76 (reproducing entry in Senate Journal of April 3, 1790).

o    Delaware, January 28, 1790, 1 *First Congress*, at 253-54 (reproducing entry in Senate Journal of March 8, 1790).

o    Vermont, November 3, 1791, Schwartz, at 1202-03; *Bill of Rights and the States*, at xxii.

o    Virginia, December 15, 1791, Schwartz, at 1202.

---

[2] By contrast, the third through twelfth proposed amendments, now known as the Bill of Rights, were ratified by the requisite eleven States by December 15, 1791, when Virginia ratified them. *See Bill of Rights and the States*, at xxii; Schwartz, at 1201-02.

107

The Bill of Rights was ratified without the Congressional Pay Amendment by five States, two of which have since ratified the Congressional Pay Amendment:

o    New Hampshire ratified the first and third through twelfth proposed amendments on January 25, 1790. 1 *First Congress*, at 348-49 (reproducing entry in Senate Journal of June 14, 1790). The document transmitted to the Congress indicates that it "rejected" the second article of the proposed amendments. *Id.* at 348.

New Hampshire subsequently ratified the Congressional Pay Amendment on March 7, 1985. *See* 131 Cong. Rec. 6689 (1985); 138 Cong. Rec. S6831 (daily ed. May 19, 1992).

o    New Jersey ratified all but the second amendment on November 20, 1789. 1 *First Congress*, at 475-76 (reproducing entry in Senate Journal of August 6, 1790). The notification transmitted to Congress did not mention the second proposed amendment. *Id.*

New Jersey subsequently ratified the Congressional Pay Amendment on May 7, 1992. 138 Cong. Rec. S6831, S6846 (daily ed. May 19, 1992).

o    The New York legislature ratified the first and third through twelfth proposed amendments on February 24, 1790. 1 *First Congress*, at 279-80 (reproducing entry in Senate Journal of April 5, 1790).[3] The document transmitted to the Congress indicates that it ratified all of the proposed amendments "except the second." *Id.* Although that document does not mention a formal rejection of the proposed amendment, a contemporary newspaper account reported that it was rejected by a vote of 52 to 5. Schwartz, at 1178.

o    Rhode Island ratified all but the second amendment on June 11, 1790. *See* 1 *First Congress*, at 389 (reproducing entry in Senate Journal of June 30, 1790); *Bill of Rights and the States*, at xxii. The notification transmitted to Congress does not mention the second proposed amendment. 1 *First Congress*, at 389.

o    Pennsylvania ratified all but the first and second proposed amendments on March 10, 1790. 1 *First Congress*, at 260-61 (reproducing entry in Senate Journal of March 16, 1790). The notification transmitted to Congress does not mention the amendments that were not ratified. *Id.* Newspaper accounts indicate that the first two amendments were postponed for further consideration, but there is no indication of whether they were formally rejected. Schwartz, at 1176.

Massachusetts, Connecticut, and Georgia did not notify the federal government of any action on the proposed amendments.[4]

Further action to impose a constitutional limitation on congressional pay did not come until 1816. During its first session, the Fourteenth Congress passed a law replacing its per diem pay, which had remained unchanged since the first Congress, with a salary of $1500 per year. Act of Mar. 19,

---

[3] The resolution was approved by New York's Council of Revision on February 27, 1790. 1 *First Congress*, at 280.

[4] Massachusetts presented a unique case. Its legislative records indicate that it considered the amendments, and agreed to ratify most. The Congressional Pay Amendment was "rejected" by the Massachusetts Senate, Schwartz, at 1174, and was "not accepted" by the Massachusetts House. *Id.* at 1175. However, Massachusetts did not notify the federal government of these actions. *Id.* at 1172. When Secretary of State Thomas Jefferson sought such notification, he was told that the Massachusetts legislature had never passed the official bill ratifying the amendments. *Id.* at 1175. Massachusetts ultimately ratified the Bill of Rights in 1939, as did Georgia and Connecticut. *Bill of Rights and the States*, at xxii.

1816, ch. 30, 3 Stat. 257. *See also* 29 Annals of Cong. 199-204 (1816). The Compensation Act was extraordinarily unpopular. *See* Henry Adams, *History of the United States of America During the Administrations of James Madison* 1274-76 (Library of America 1986). Immediately upon convening the second session of the Congress, a bill repealing the Act was introduced. *See* 30 Annals of Cong. 10 (1816). Beyond merely a repeal of the offensive statute, Senator James Barbour introduced a joint resolution proposing a constitutional amendment identical to the Congressional Pay Amendment in all but punctuation:

> No law varying the compensation for services of the Senators and Representatives shall take effect until an election of Representatives shall have intervened.

*Id.* at 30. *See also* Herman V. Ames, *The Proposed Amendments to the Constitution of the United States During the First Century of its History*, H.R. Doc. No. 353, 54th Cong., 2d Sess., pt. 2, at 34 (1897) ("Ames"). Congress repealed the Compensation Act, *see* Act of Feb. 6, 1817, ch. 9, 3 Stat. 345, but did not act on the proposed amendment.

Nevertheless, several states joined the call for such an amendment. On January 17, 1817, the General Assembly of Kentucky proposed a constitutional amendment nearly identical to the Congressional Pay Amendment:

> That no law varying the compensation of the members of the congress of the United States, shall take effect until the time for which the members of the house of representatives of that congress by which the law was passed, shall have expired.

1816-17 Ky. Laws 279. *See also* Ames, at 333. The legislatures of Massachusetts and Tennessee passed resolutions proposing similar amendments. Ames, at 34-35, 333. Tennessee's resolution, identical to that of Kentucky except for punctuation and capitalization, was received by the Senate and printed in the *Annals of Congress* although only by a narrow vote after "considerable debate." 31 Annals of Cong. 170 (1818). Congress took no action on any of these proposals. The legislature of Illinois, however, passed a resolution criticizing Kentucky's proposed amendment as "unnecessary and inexpedient" and directing Illinois's representatives in Congress to oppose the proposal. 1821 Ill. Laws 187. Illinois's resolution was transmitted to Congress. 38 Annals of Cong. 35 (1821). Vermont, Ohio and New Hampshire also passed resolutions opposing Kentucky's proposal. 1817 Vt. Laws 100-01; 1818 Ohio Laws 202-03; 1818 N.H. Laws 165. *See also* Ames, at 333. It does not appear that any of those States took action at that time to ratify or reject the Congressional Pay Amendment proposed by the first

109

Congress, nor is there any indication whether anyone at the time considered that amendment to be pending before the States.[5]

In 1822, three new amendments related to congressional salaries were proposed, though Congress did not act on any of them. Ames, at 35. One was essentially the same as the Congressional Pay Amendment, except that it did not apply to Senators:

> That no increase or diminution of the compensation to Representatives, for their services as such, shall be made by Congress, to have effect or operation during the period for which the members of the House of Representatives, acting upon the subject, shall have been elected.

39 Annals of Cong. 1752 (1822). Another fixed the compensation of members of Congress at the amount paid to members of the first Congress. *See id.* at 1768. The third provided that compensation for members of Congress, as well as the President and Vice President, would be fixed every ten years, after the census, and that alterations would take effect only after the particular official's current term had expired. *Id.* at 1777-78. Again, there is no indication whether those members proposing the amendments believed that the amendment proposed by the first Congress was still pending. The brief remarks in the *Annals of Congress* do not address the issue. *See id.* at 1753, 1768.

The only state to take formal action on the Congressional Pay Amendment in the 19th century was Ohio. Its General Assembly ratified the proposed amendment on May 6, 1873. As expressed in the ratifying resolution, the legal theory was straightforward: under Article V, proposed amendments become valid when ratified by three-fourths of the States, and the Congressional Pay Amendment "not having received the assent of the Legislatures of three-fourths of the several States is still pending for ratification." 1873 Ohio Laws 409 (joint resolution ratifying the second article of the twelve amendments to the Constitution submitted by the first Congress).[6] It is unclear what became of Ohio's ratification. Although the resolution called upon the governor to transmit the ratification to the President and Congress, more than one hundred years later, in 1985, the National Archives and Records Service reported that Ohio, as well as several other States, had not sent official notice of ratification to the federal government. Robert S. Miller and Donald O. Dewey, *The Congressional Salary Amendment: 200 Years Later,* 10 Glendale

---

[5] Vermont had already ratified the Congressional Pay Amendment and New Hampshire had previously rejected it. *See supra,* pp. 107-08.

[6] Ohio's action received considerable attention early in this century, when several proposals were made to amend the Constitution to impose a time limit on ratification for all amendments. Members of Congress supporting the proposal pointed to Ohio's ratification of the Congressional Pay Amendment as a prime example of the consequences of having no time limits on amendments. *See e.g.,* 55 Cong. Rec. 5556-57 (1917); 58 Cong. Rec. 5697, 5699 (1919).

L. Rev. 92, 102 (1991).[7] Those States have since transmitted official notices. *See id.*; 57 Fed. Reg. 21,187, 21,188 (May 19, 1992) (Archivist's certification of the 27th Amendment, listing the forty states that had ratified the amendment and transmitting notification to the Archivist before May 18, 1992); 138 Cong. Rec. S6835 (daily ed. May 19, 1992).

The controversial pay increase that provoked Ohio's ratification led to activity in Congress as well. Just as in the early 1800's, several new amendments, similar to that proposed by the first Congress, were introduced. Ames at 35. Congress took no action on them, however, instead repealing the pay increase. *Id.*

The next action on the Congressional Pay Amendment did not come until March 3, 1978, when the Wyoming legislature ratified it. *See* 124 Cong. Rec. 7910 (1978).[8] Five years later, on April 27, 1983, Maine ratified the amendment, 130 Cong. Rec. 25,007-08 (1984), bringing the total number of ratifications to nine. Since then, thirty-two additonal States have ratified the amendment, most recently Missouri and Alabama on May 5, 1992, Michigan and New Jersey on May 7, 1992, Illinois on May 12, 1992, and California on June 26, 1992. *See* 57 Fed. Reg. 21,187, 21,188 (May 19, 1992) (Archivist's certification); 138 Cong. Rec. E2237 (daily ed. July 24, 1992) (California). Thus, forty-one States have now ratified the amendment, three more than three-fourths of the fifty States.

Some States that have ratified recently have elaborated the legal basis for their actions in their ratifying resolutions. Fourteen States mentioned the Supreme Court's decision in *Coleman v. Miller*, 307 U.S. 433 (1939), in their ratifying resolutions. Many used language to this effect:

> Whereas, the legislature of the state of New Mexico acknowledges that the article of amendment to the constitution of the United States proposed by resolution of the First Congress on September 25, 1789, may still be ratified by states' legislatures as a result of the ruling by the United States supreme court in the landmark case of *Coleman v. Miller*, 307 U.S. 433 (1939) . . . .

132 Cong. Rec. 3956 (1986) (New Mexico). *Accord* 134 Cong. Rec. 14,023 (1988) (Arkansas); 133 Cong. Rec. 11,618-19 (1987) (Montana); 135 Cong. Rec. 15,623 (1989) (Nevada); 135 Cong. Rec. 20,519-520 (1989) (Oregon); 135 Cong. Rec. 11,900-01 (1989) (Texas); 136 Cong. Rec. S9170 (daily ed. June 28, 1990) (Kansas); 137 Cong. Rec. S10,949 (daily ed. July 25, 1991) (North Dakota); 138 Cong. Rec. S6845 (daily ed. May 19, 1992) (Alabama).[9]

Other States referred to *Coleman* without expressly tying it to their power

---

[7] It should be noted that notice of ratification by at least some of those States had been previously received by Congress and published in the Congressional Record. *See* 124 Cong Rec. 7910 (1978) (Wyoming); 130 Cong. Rec. 25,007-08 (1984) (Maine).

[8] The Governor of Wyoming signed the ratification on March 6, 1978. Miller and Dewey, 10 Glendale L. Rev., *supra*, at 100.

[9] For ease of reference, we have cited to the resolutions as reprinted in the Congressional Record,
Continued

to ratify the Congressional Pay Amendment, and also noted the lack of any time limit either generally in Article V or specifically in the Congressional Pay Amendment as proposed to the States. For example, Colorado, which on April 22, 1984, became the tenth State to ratify the amendment, states:

> Whereas, Article V of the United States Constitution does not state a time limit on ratification of an amendment submitted by Congress, and the First Congress specifically did not provide a time limit for ratification of the proposed amendment; and
>
> Whereas, The United States Supreme Court has ruled in *Coleman v. Miller*, 307 U.S. 433 (1939), that an Amendment to the United States Constitution may be ratified by states at any time, and Congress must then finally decide whether a reasonable time had elapsed since its submission when, in the presence of certified ratifications by three-fourths of the States, the time arrives for the promulgation of the adoption of the amendment, . . . .

138 Cong. Rec. S6837 (daily ed. May 19, 1992) (Colorado). *Accord* 135 Cong. Rec. 5821 (1989) (Iowa); 135 Cong. Rec. 14,147 (1989) (Minnesota); 138 Cong. Rec. S14,974 (daily ed. Sept. 24, 1992) (Missouri); 138 Cong. Rec. S8387 (daily ed. June 17, 1992) (Illinois).

Other States have not cited *Coleman*, and instead have emphasized, as Ohio did, the absence of a time limit in the Congressional Pay Amendment proposal. For example, Wyoming, the first State to ratify the amendment in this century, stated in its ratifying resolution:

> Whereas the Congress of the United States, upon proposing that amendment, did not place any time limitation on its final adoption . . . .

1978 Wyo. Sess. Laws. 427. *Accord* 134 Cong. Rec. 9525 (1988) (Georgia); 134 Cong. Rec. 8752 (1988) (West Virginia); 135 Cong. Rec. 14,816 (1989) (Alaska); 136 Cong. Rec. S10,091 (daily ed. July 19, 1990) (Florida). *See also* 133 Cong. Rec. 24,779 (1987) (Wisconsin) (noting additionally that "the congress of the United States has the power to impose reasonable time

---

[9] (....continued)
although such publication has no independent legal consequence. The States generally transmit certified copies of the resolutions directly to the Archivist of the United States. The resolutions, except for California's, are also reprinted together in the Congressional Record. *See* 138 Cong. Rec. S6831-46 (daily ed. May 19, 1992). A tabulation by the Archivist of the dates of ratification can be found in the Congressional Record. *Id.* at S6831.

limits for the ratification of proposed amendments"). Wisconsin's ratification is noteworthy also because it is the only one that provides a rationale for the authority to ratify an amendment that was proposed before the State entered the Union:

> Whereas, the congressional pay changes amendment was validly ratified by the state of Vermont on November 3, 1791, even though Vermont had not been one of the original 13 states to which the proposed amendment had been submitted, and had not yet achieved statehood when the amendment was submitted . . . .

*Id.*

Finally, many States mention neither *Coleman* nor time limits, nor allude to the fact that the amendment is approximately 200 years old. *See* 130 Cong. Rec. 25,007-08 (1984) (Maine); 1985 S.D. Laws 27 (South Dakota); 131 Cong. Rec. 6689 (1985) (New Hampshire); 131 Cong. Rec. 9443 (1985) (Arizona); 131 Cong. Rec. 27,963 (1985) (Tennessee); 131 Cong. Rec. 27,963-64 (1985) (Oklahoma); 132 Cong. Rec. 8284 (1986) (Indiana); 132 Cong. Rec. 12,480 (1986) (Utah); 133 Cong. Rec. 23,571 (1987) (Connecticut); 134 Cong. Rec. 18,760 (1988) (Louisiana); 135 Cong. Rec. 14,572-73 (1989) (Idaho); 138 Cong. Rec. S7026 (daily ed. May 20, 1992) (Michigan); 138 Cong. Rec. S6846 (daily ed. May 19, 1992) (New Jersey); 138 Cong. Rec. E2237 (daily ed. July 24, 1992) (California). The Idaho legislature's resolution was based, pursuant to state law, on a state referendum on the amendment. 135 Cong. Rec. 14,572-73 (1989).

The Archives has indicated that it has received no rescissions of previous ratifications of the Congressional Pay Amendment, nor have we found any public record of rescissions.[10]

---

[10] Several of the States that have ratified the amendment, however, had previously rejected it. To the extent reflected in documents transmitted to the federal government, New Hampshire had expressly rejected the amendment, while New Jersey had simply failed to ratify it when ratifying the other proposed amendments. In 1817, Vermont, which had ratified the amendment in 1791, passed a resolution opposing a similar amendment proposed by Kentucky, but the resolution specifically refers to the Kentucky, proposal and does not purport to rescind Vermont's earlier ratification of the Congressional Pay Amendment. *See supra*, p. 109. Oklahoma's ratification purports to have an expiration date — December 31, 1995 — pursuant to state law. 131 Cong. Rec. 27,964 (1985).